SOUTH TEXAS DEVELOPMENT CO.
v. MANNING. (No. 5499.)

(Court of Civil Appeals of Texas. San Antonio. June 2, 1915. Rehearing Denied June 23, 1915.)

1. ADVERSE POSSESSION ⊝115 — INSTRUCTED VERDICT—EVIDENCE.

Where, in an action of trespass to try title, wherein defendant claimed title by adverse possession, the evidence was conflicting on whether he had been in continuous undisputed possession of the part of the premises under fence for the requisite period, the court properly refused to instruct a verdict for plaintiff for all of the land, though it conclusively appeared that he had no title to the remainder of the premises.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 314, 691–701; Dec. Dig. ⊝115.]

2. ADVERSE POSSESSION ⊝100 — PRESCRIPTIVE TITLE—POSSESSION OF LAND.

The occupancy of a part of uninclosed land by the true owner, though only for the purpose of cutting timber, carries with it the constructive possession of such part of the whole tract as is not in the actual occupancy of one claiming title by limitation.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 547–574; Dec. Dig. ⊝100.]

3. ADVERSE POSSESSION ⊝47—PRESCRIPTIVE TITLE—CONTINUITY OF POSSESSION.

The occupancy of uninclosed land for the purpose of cutting timber under authority from the true owner was sufficient to break the continuity of possession of an adverse claimant.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 234, 235; Dec. Dig. ⊝47.]

4. ADVERSE POSSESSION ⊝114 — PRESCRIPTIVE TITLE—SUFFICIENCY OF EVIDENCE.

Evidence in an action of trespass to try title to land, part of which was inclosed and part uninclosed, wherein defendant claimed title by adverse possession, held insufficient to show that defendant had title to the uninclosed land.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 682, 683, 685, 686; Dec. Dig. ⊝114.]

Appeal from District Court, Montgomery County; J. Llewellyn, Judge.

Action by the South Texas Development Company against Walter Manning. From judgment for defendant, plaintiff appeals. Reversed and remanded.

John W. Lewis, of Houston, for appellant. C. W. Nugent, of Conroe, for appellee.

CARL, J. Appellant states the case thus: "This was an action of trespass to try title, filed by the South Texas Development Company against Walter Manning for 384.3 acres of land, a part of the Texas & New Orleans Railroad Company survey No. 15, in Montgomery county, Tex. Appellee, Walter Manning, answered, disclaiming as to all of said land sued for, except 160 acres out of said tract, which he claimed by statute of limitations of 10 years, and setting up by definite description the 160 acres claimed by him. On the trial, appellant showed a perfect record title to the éntire 384.3-acre tract sued for. The court charged the jury that the uncontroverted evidence showed the appellant to have the legal title to all of the land described in its petition, and is entitled to recover of the appellee, unless such recovery is defeated by his plea of limitation. The case was tried with the aid of a jury, who returned a verdict for appellee for 160 acres of land, and judgment was entered accordingly for said appellee.

The period during which it is claimed Manning's limitation title matured began about September 6, 1902. It is admitted that one Ed Payne and Joe McDonald, at different times during the 10-year period, were living upon the premises, the difference of opinion being as to the capacity in which they were in possession. Appellee claims that McDonald got permission from his tenant, E. A. Smith, to stay in the house while he, McDonald, was cutting ties on this 160 acres and other lands. McDonald bought Manning's little crop of sweet potatoes at the time he went into possession of the house and premises in 1906. Appellee admits this, but claims that McDonald became his tenant through permission from Smith, whom he had placed in charge of the place. It is not denied that McDonald was working under authority of the record owner in cutting crossties.

Appellee testified, on the trial, substantially, to the following facts:

He says that he married in March, 1902, and that he went upon this land about the 6th of September of that year; that he went upon it on his own hook. "I did not buy a claim from any one. There was no one claiming it that I knew of. If Mr. Payne was claiming the improvements, I did not know it; I did not know who put the house there." He says that he went upon it with the intention of acquiring

the title by 10 years' limitation; that he offered to give Ed Payne $25 for a quitclaim deed to the place if he and his father could show any substantial claim; that he would simply pay them for their rights, but that Payne did not claim to have any rights and he did not buy it. There were four or five acres under fence at that time, part of it grown up with bushes. There was a little box house on it in 1902, and he says he lived there continuously about five years, raising a crop in 1903, consisting of potatoes, corn, cotton, sorghum, etc., and in 1904 and 1905 he made a crop there. "It was in 1906 that I moved my wife over to my father-in-law's and did contract work. My father-in-law's name was Uriah Smith. I moved over there about January 1, 1906, and did contract work that year, and did not live on the place at all that year, but Mr. Smith cultivated the place for me and raised a crop of goobers, oats, and sorghum, and used it as a general pasture. No one lived on the place that year, but Mr. Smith put in his crop at the usual time in the spring of the year. In 1907 I did not live on the place, but cultivated it myself. I lived at Mr. Smith's in 1907. * * * I had seven or eight acres in cultivation and under fence. I don't remember whether it was 1907 or 1908 that I lived at Uriah Smith's, but to the best of my recollection it was 1907 that I tore the old house down and moved it over to Uriah Smith's. I lived at Uriah Smith's that year, but cultivated the place myself. In 1908 there was no house on the place, but I cultivated it myself. In 1910 I built a new house. After the South Texas Development Company people were in there surveying, I built the new house. In 1909 I lived with Smith, but I cultivated the land and along in the summer—about August, I think, of 1910—I built the new house and have been living there continuously since. When I stated in my evidence that I had lived on the place continuously for 11 years, I meant that I had held possession of the place and claimed it and made it my home, and had my stock there. I moved off the place and lived off of it one or two years, but I cultivated it. I rented the place only one year to Mr. Smith. * * * It was in 1906, while I was doing contract work, that I was told that Ed Payne had moved into the house. He lived there only a short time, I don't remember how long. I knew my father-in-law would take care of my interest. Ed Payne did not live there over two or three months. I came back in February, 1907, and cultivated the land myself that year." He says, further, that his father-in-law, Smith, as his agent and tenant, gave Joe McDonald permission to move into the house; that he cultivated the land himself that year, but was not living there. He says that it was later than June, 1907, when McDonald moved into the house, because he sold him his sweet potato crop growing around the house, but he does not remember how long he lived there, but thinks it was during the summer and fall of that year. "* * * I did not give Mr. McDonald permission to move into the house, but he got permission from Mr. Smith. I was working at Waukegan as a day laborer, but I was working my place. I had 7 or 8 acres in cultivation and when I would catch up with my crop I would work out as a day-laborer. Although I was working part of the time right there at the house, McDonald got permission from my father-in-law to move into the house. My father-in-law is now dead. While McDonald lived in this house he was cutting ties off the entire tract, including my 160 acres, cutting them for the Kirby Lumber Company, or for Mr. Bennette, who I suppose was the agent for the Kirby Lumber Company. I did not know this timber belonged to the Conroe Lumber Company; I knew they claimed it. I did object to McDonald cutting ties on this 160 acres, and went to town to try and find out if I could stop him, and my lawyer told me I did not have any right to; that I would have to wait until the ten years run out. I went on this land and set up my claim, * * * and knew it would be mine if I could stay there 10 years. I did not know the Conroe Lumber Company was claiming this land, did not know anybody was claiming it but me, but I heard the Conroes were claiming it. * * * Ed Payne stayed there two or three months, probably. I moved some lumber there to improve the place, and afterwards moved it away, but no one notified me to move it. I sold the lumber to old man Goss. * * * Joe McDonald * * * did not pay any rent. He agreed to take good care of the place while there, said he wanted it only for a camping place and did not want it very long."

Joe McDonald says that he recognized Will Conroe as the owner of the land while he was there cutting ties; that he knew all of the lines of the 384-acre survey, section 15, Texas & New Orleans, formerly owned by the Conroe Lumber Company and now owned by the South Texas Development Company, by reason of having cut the timber off of said tract during the years 1907 and 1908, and was governed by the lines of the tract. He says he lived there from June, 1907, continuously until March, 1908. He made ties for the Kirby Lumber Company, but never did cultivate the land while living there. He says Manning cultivated about one-fourth acre, or less, in potatoes, in the summer of 1907, and denied that he had any arrangement with Walter Manning about living on the land.

Briefly stated, and in view of the finding of the jury, it may be said that Manning occupied the premises for more than 10 consecutive years, in so far as the land in cultivation, or fenced, was concerned; but it is practically undenied that McDonald, under authority from the legal owner, cut the timber from the remainder of the land, and that for that purpose, at least, for a considerable time he was there and in possession to such an extent that Manning consulted his lawyer as to whether he could stop him from cutting the timber. He was advised that he could not do so, and acquiesced in the advice of his lawyer by remaining quiet in order to finish out the 10 years by which he expected to mature his title. While the evidence is conflicting as to the continuous, undisputed possession of Manning, as to the house and improved part of the premises, and the finding of the jury may be taken as settling that question, in so far as this case is concerned, in appellee's favor, the evidence is equally certain and conclusive that Manning did not dispute the possession and evidence of ownership of the legal title holders, nor is there any doubt that the true owners were in possession of all of said land, except the improved part, for the purpose of cutting the timber. Payne was there, and McDonald was there, and he was there to cut the timber, and did cut the timber, under authority from the owner and without any authority from, and even over the protest of, the appellee in this case.

[1] The first assignment of error complains of the action of the court in refusing to instruct a verdict for the plaintiff below for all of the land. This cannot be sustained, because the question of appellee's right to the land he had under fence and actually occupied was one for the jury to pass upon.

[2] Admittedly, this land was not under fence, except the small field; and although the evidence of the defendant below shows that he had surveyed the 160-acre tract and defined the boundaries, it was not under fence. And it has often been held in Texas, in matters of this kind, that occupancy of a part of the uninclosed land by the true owner would carry with it the constructive possession of such part of the whole tract as was not in the actual occupancy of the one claiming by limitation. Freedman v. Bonner, 40 S. W. 49; Combes et al. v. Stringer et al. (Sup.) 167 S. W. 218; Evitts v. Roth, 61 Tex. 81.

[3] Applying the above rules, as laid down in said authorities, the appellee in this case was not in possession of all of said tract of land for a continuous period of 10 years as against the true owner; and the true owner, admittedly being in possession of a part of the land, even though only for the purpose of cutting timber, was in possession constructively of all of said tract not actually inclosed by Manning. We have held, in Glover v. Pfeuffer, 163 S. W. 984, that adverse possession, as meant by the statute, need be only as against the true owner, but in this case the adverse possession of McDonald and Payne, certainly as to McDonald, was under authority from the true owner and, as a matter of course, such occupancy would break the continuity of possession of that part not inclosed and held by Manning. It, therefore, follows, from what we have said, that the second assignment will be sustained; but the matters complained of in the third and fourth assignments will be overruled because they are in conflict with our ruling in the Glover v. Pfeuffer Case, supra.

[4] The fifth assignment, which complains that the verdict is not supported by the evidence, is also sustained.

When Joe McDonald went upon this land and began cutting cross-ties, he unquestionably did so, not only without the consent of Manning, but over his protest; for there can be no doubt that he objected to it, because he went and conferred with his lawyer to ascertain if he could stop this trespassing, in so far as the timber was concerned. Possession for the purpose of cutting and removing the timber was possession as much as cultivating the land itself would have been. Appellee knew that Will Conroe, or the Conroe Lumber Company, was claiming this land, and the county records proclaimed them at that time as being the true owners there-of. He knew that McDonald was cutting the timber under claim of right from some of the owners, the land having changed hands several times during the period he claims to have matured the title by limitation. If they had ousted him of possession of the field and house, as it is contended they actually did, it would have been no more effective in so far as stopping the running of limitation is concerned, than was the undisputed possession of the outlying land for the purpose of cutting the timber. The question, however, of possession of the inclosed land and house by McDonald so as to break the continuity of limitation was one for the jury. The amount of the land so held is uncertain and undefined.

Therefore the judgment is reversed, and the cause remanded for trial.